UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

RECEIVED
JUN 17 2024
ROBERT KIRSCH
U.S. DISTRICT JUDGE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. ROBERT KIRSCH |
| v. | : | Crim. No. 24-398 |
| ARON PURETZ | : | 18 U.S.C. § 371 |
| | : | 18 U.S.C. § 1343 |

# INFORMATION

Defendant Aron Puretz having waived in open court prosecution by Indictment, the United States charges:

(Conspiracy to Commit Wire Fraud Affecting a Financial Institution)

## Background and Relevant Parties

1. At all times relevant to this Information:

    a. Defendant Aron Puretz, was an employee of Apex Equity Group and a partial owner of Troy Technology Holdings LLC, JPC Maple Lawn Limited, and Apex Big Chateau AR LLC.

    b. Troy Technology Park was a commercial office complex in Troy, Michigan. Troy Technology Park was bought by Troy Technology Holdings LLC in 2020.

    c. Maple Lawn was an apartment complex in Eureka, IL. Maple Lawn was bought by JPC Maple Lawn Limited, an Ohio not-for-profit corporation in 2017.

1

d.  JPC Charities was a nonprofit entity created and managed by defendant Aron Puretz for the purpose of receiving tax-exempt status for properties owned by defendant Aron Puretz. Various related versions of JPC Charities were created by defendant Aron Puretz for this purpose, including JPC Maple Lawn Limited.

e.  Big Country Chateau was an apartment complex in Little Rock, Arkansas. Big Country Chateau was bought by Apex Big Chateau AR LLC in 2019.

f.  Apex Big Chateau AR LLC listed O.Z. as the owner of Big Country Chateau, but defendant Aron Puretz was in fact the actual owner.

g.  Integra Affordable Management was a property management company owned and managed by defendant Aron Puretz.

h.  "Financial Institution 1" was a financial institution as defined by 18 U.S.C. § 20, with headquarters in New York, New York. Financial Institution 1 issued a mortgage loan for the purchase of Troy Technology Park.

i.  "Financial Institution 2" was a financial institution as defined by 18 U.S.C. § 20, with headquarters in New York, New York. Financial Institution 2 issued a mortgage loan for the purchase of Maple Lawn.

j.  "Financial Institution 3" was a financial institution as defined by 18 U.S.C. § 20, with headquarters in Dallas, Texas. Financial Institution 3 issued a mortgage loan for the purchase of Big Country Chateau.

k.  Riverside Abstract ("Riverside") was a title company with offices in Lakewood, New Jersey.

l.  Apex Equity Group ("Apex") was a privately held real estate investment and advisory firm that was based in Newark, New Jersey.

m.  The Federal Home Loan Mortgage Corporation, known as "Freddie Mac," was a government-sponsored enterprise formed by the United States Congress.  Among other purposes, Congress formed Freddie Mac to purchase mortgages, including for multi-family properties, to increase the amount of money available in the mortgage lending market.  Freddie Mac worked with certain approved financial institutions that issued loans, sold loans to Freddie Mac, and serviced loans on behalf of Freddie Mac.

n.  The United States Department of Housing and Urban Development ("HUD") was the federal agency responsible for national policy and programs that addressed America's housing needs.  HUD underwrote homeownership for lower- and moderate-income families through its mortgage insurance programs and project-based assistance.

o.  After purchasing loans from the approved financial institutions, Freddie Mac grouped the loans into packages containing multiple loans.  It sold these packages of loans to investors in a process known as securitization.  Owning or investing in multiple loans grouped together reduced the risk of loss if a borrower defaulted on any one loan in a package.  Once loans were securitized into a package of loans, the total package of loans was serviced by a master servicer entity that coordinated with the servicers of the individual loans in the securitized packages.

p.  "Co-Conspirator 1" was an employee of Apex, a firm that was a partial owner of Troy Technology Holdings LLC, and, thereby, an indirect owner of Troy Technology Park.

q.  Boruch Drillman, a/k/a "Barry Drillman," managed Troy Technology Holdings LLC.

r.  Individual 1 was the founder and CEO of Aandar Real Estate Capital, which was based in Rochelle Park, New Jersey.

s.  An "arm's length" transaction was one where the buyer of a property did not have a preexisting familial or business relationship with the seller.

t.  A Purchase and Sale Agreement ("PSA") was a document that was written and signed after a buyer and seller mutually agreed on the price and terms of a real estate transaction.

u.  A Letter of Intent ("LOI") was a document that outlined the terms of a potential sale of a property and served as an "agreement to agree" between two parties.

### Commercial Property Mortgage Lending Process

2.  When a real estate developer or "sponsor" identified a commercial property they were interested in purchasing, the sponsor or their broker typically reached out to the current owner and sent an LOI outlining their interest in the property, potential sales price, and sponsor due diligence. If the current owner (*i.e.*, the seller) agreed to the terms, the sponsor and seller entered into a PSA outlining in greater detail the specifics of the sale transaction.

4

3.      Around the same time of the LOI or PSA, the sponsor typically sought financing for the transaction. Financing a commercial property generally involved loans with seven- to ten-year terms, with balloon payments at the end of the term. At the expiration of a term, when the balloon payment was due, borrowers often re-financed the loan to satisfy the balloon payment and any other outstanding debts. Lenders generally loaned up to approximately eighty percent of the value of the property. Lenders typically required a borrower to fund the remaining twenty percent equity requirement with cash, so the sponsor had a financial stake in the property's future value and performance.

4.      Financial institutions that were considering issuing a loan on a commercial property evaluated several factors to determine whether to make the loan, including, among other considerations, the value of the property. To determine the value of the property, the lender typically hired an appraiser.

5.      Appraisers assumed the PSA was an arm's length transaction, and typically an appraiser valued the property at or close to the purchase amount in the PSA.

### The Conspiracy

6.      From at least as early as in or about 2016, through in or about 2022, in the District of New Jersey, and elsewhere, the defendant

ARON PURETZ,

did knowingly and willfully conspire and agree with others, to commit an offense against the United States, namely, wire fraud affecting a financial institution, that is, to knowingly, and with the intent to defraud, having devised and intending to

5

devise a scheme and artifice to defraud Financial Institution 1, Financial Institution 2, Financial Institution 3, and Freddie Mac, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing such pretenses, representations, and promises were false and fraudulent when made, and, for the purpose of executing such scheme and artifice to defraud, did transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, affecting one or more financial institutions, contrary to Title 18, United States Code, Section 1343.

## Objects of the Conspiracy

7. It was an object of the conspiracy to induce financial institutions to issue commercial mortgage loans, and to induce Freddie Mac to purchase those loans, based on false pretenses, representations, and promises regarding the inflated values of the commercial properties, and the concealment of material facts, and to enrich defendant Aron Puretz and his co-conspirators with the inflated loan proceeds generated by the fraudulently obtained loans.

## Manner and Means of the Conspiracy

*Troy Technology Park Transaction*

10. It was a part of the conspiracy that conspirators engaged in a "flip" transaction, in which they used a related party to serve as a straw buyer in order to purchase Troy Technology Park for approximately $42,700,000 before selling or flipping the property to Boruch "Barry" Drillman for approximately $70,000,000. The $70,000,000 purchase price was falsely presented to Financial Institution 1 as the

price negotiated to purchase the property at arm's length. The purchase price was a key input used by Financial Institution 1 to determine the market value of the property. Members of the conspiracy purposely misled and concealed from Financial Institution 1 the true sales price of approximately $42,700,000.

11.  It was further a part of the conspiracy that, based on the co-conspirators' false statements to Financial Institution 1, on or about September 25, 2020, Financial Institution 1 issued a loan to Troy Technology Holdings LLC, which was co-owned by defendant Aron Puretz, in the amount of approximately $45,000,000 for the purchase of Troy Technology Park. The conspirators further misrepresented to Financial Institution 1 that this loan amount was approximately 65% of the $70,000,000 purchase price.

*Maple Lawn*

12.  It was further a part of the conspiracy that co-conspirators engaged in a "flip" transaction, in which they utilized the identity of other individuals to purchase the Maple Lawn property for approximately $4,100,000 before selling or flipping the property to a co-conspirator for approximately $5,800,000. The $5,800,000 purchase price was falsely presented to Financial Institution 2 and Freddie Mac as the price negotiated to purchase the property at arm's length. The purchase price was a key input used by Financial Institution 2 and Freddie Mac to determine the market value of the property. Members of the conspiracy purposely misled and concealed the true sales price of $4,100,000.

13. It was further a part of the conspiracy that, based on the conspirators' false statements, on or about February 16, 2017, Financial Institution 2 and Freddie Mac funded a loan to JPC Maple Lawn Limited, for the purchase of Maple Lawn.

14. It was further a part of the conspiracy that, based on the conspirators' false statements that JPC Maple Lawn Limited was a bona fide non-profit, the city of Eureka, IL approved a property tax exception for JPC Maple Lawn Limited.

*Big Country Chateau*

15. It was further a part of the conspiracy that defendant Aron Puretz and his co-conspirators utilized the identity of an individual, O.Z., to purchase Big Country Chateau concealing from Freddie Mac and HUD the true ownership of the property.

16. It was further a part of the conspiracy that, based on the conspirators' false statements, on or about July 31, 2019, Financial Institution 3 and Freddie Mac funded a loan to Big Country Chateau AR LLC for the purchase of Big Country Chateau.

**Overt Acts in Furtherance of the Conspiracy**

17. In furtherance of the conspiracy, at least one of the co-conspirators committed at least one of the following overt acts, among others, in the District of New Jersey and elsewhere:

*Troy Technology Park Transaction*

18. On or about February 25, 2020, Co-Conspirator 1 sent an email to an employee of the seller of Troy Technology Park, with an attached LOI from Apex dated on or about February 17, 2020, with an offer to purchase Troy Technology Park

for approximately $42,000,000. The letter was signed by defendant Aron Puretz as a Managing Member of Apex.

19. On or about June 11, 2020, Individual 1 sent an email to an Executive Director at Financial Institution 1 seeking a loan for Troy Technology Park. In this email, Individual 1 stated that Barry Drillman was the sponsor who was purchasing the property for approximately $65,000,000 and seeking a loan of approximately $48,750,000.

20. On or about July 10, 2020, the seller of Troy Technology Park entered into an agreement with Co-Conspirator 1 to sell the property for approximately $45,200,000.

21. On or about September 14, 2020, Individual 1, to justify the $70,000,000 purchase price, sent an email and attachment to Financial Institution 1. The attached file was an LOI to purchase Troy Technology Park for $68,800,000. This LOI was sent, in turn, to the appraiser by Financial Institution 1.

22. On or about September 25, 2020, the sale of Troy Technology Park was completed. The morning of closing, Co-Conspirator 1 sent Individual 1 two closing statements—one for the actual sales price ($42,700,000), and the other for the false, inflated sales price ($70,000,000)—in order to conceal the actual Troy Technology Park closing price from Financial Institution 1. Riverside utilized the closing statements and performed two closings on the property, one for the seller with a contract price of $42,700,000, and one for the lender with a contract price of $70,000,000.

9

23. Furthermore, members of the conspiracy provided a short term one-week loan of approximately $30,000,000 to support the closing for the inflated sales price.

### Maple Lawn

24. On approximately June 27, 2016, Barry Drillman, acting on behalf of a shell company, entered into a contract with the owner of Maple Lawn Apartments to buy the property for $4,100,000.

25. Defendant Aron Puretz and co-conspirators presented the lenders, Financial Institution 2 and Freddie Mac, with a purchase price of approximately $5,800,000.

26. Based on the inflated purchase price, Financial Institution 2 and Freddie Mac funded a $4,475,000 loan for Maple Lawn. On approximately February 17, 2017, Riverside Abstract performed two closings on the property, one for the seller with a contract price of $4,100,000, and another for lender with a contract price of $5,800,000.

27. Defendant Aron Puretz had an ownership interest in the entities buying Maple Lawn and hid his ownership interest, as he was aware that the mortgage would not have been approved if his ownership interest was disclosed.

### Big Country Chateau

28. On or about February 19, 2019, defendant Aron Puretz entered into an agreement with the owner of Big Country Chateau to buy the property utilizing a shell company.

29. In order to obtain financing for the Big Country Chateau transaction,

10

defendant Aron Puretz submitted false information to Financial Institution 3 stating that O.Z. was acquiring Big Country Chateau, when in truth and in fact defendant Aron Puretz was acquiring the property. Additionally, Integra Affordable Management was falsely listed as the third-party non-affiliated property management company, when in truth and in fact it was affiliated because defendant Aron Puretz owned Integra.

30.  Based on these and other false statements, on or about July 31, 2019, Financial Institution 3 and Freddie Mac funded a loan for the purchase of Big Country Chateau for approximately $5,220,000.

31.  After the purported purchase by O.Z., defendant Aron Puretz continued to conceal his identity as the true buyer and owner of Integra, as he was aware that the mortgage would not have been approved if his identity as the true buyer or his ownership interest in Integra was disclosed.

In violation of Title 18, United States Code, Section 371.

## FORFEITURE ALLEGATION

1. The allegations contained in this Information are realleged here for the purpose of noticing forfeiture pursuant to Title 18, United States Code, Section 982(a)(2)(A).

2. The United States gives notice to defendant Aron Puretz that, upon conviction of the offense charged in this Information, the United States will seek forfeiture, in accordance with Title 18, United States Code, Sections 982(a)(2)(A), of any and all property, real and personal, that constitutes or was derived, directly and indirectly, from proceeds obtained as the result of the offense, including, but not limited to, the sum of United States currency to be determined by the court to be evidenced by a monetary judgment issued by this Court in aforesaid amount. Said judgment will accrue at the prevailing rate per annum and serve as a judgment and lien against defendant Aron Puretz's property, wherever situated until fully satisfied.

3. If by any act or omission of defendant Puretz, any of the property subject to forfeiture described above:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1),

to seek forfeiture of any other property of defendant Puretz up to the value of the above-described forfeitable property.

GLENN S. LEON
Chief, Fraud Section
Criminal Division
U.S. Department of Justice

*Siji Moore*
Siji Moore
Trial Attorney, Fraud Section
Babasijibomi.Moore2@usdoj.gov
1400 New York Ave, N.W.
Washington, D.C. 20005
Tel: 202-834-2793

PHILIP R. SELLINGER
United States Attorney

CASE NUMBER: _____

# United States District Court
# District of New Jersey

UNITED STATES OF AMERICA

v.

ARON PURETZ

## INFORMATION FOR

18 USC § 371

PHILIP R. SELLINGER
UNITED STATES ATTORNEY
FOR THE DISTRICT OF NEW JERSEY

SIJI MOORE
TRIAL ATTORNEY
FRAUD SECTION
MARTHA K. NYE
ASSISTANT U.S. ATTORNEY
TRENTON, NEW JERSEY
609-989-0579